



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2014 FEB 13  PM 12: 40

WILLIAM W. BLEVINS
CLERK

**FELONY**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**INDICTMENT FOR CONSPIRACY TO COMMIT CRIMINAL COPYRIGHT INFRINGEMENT, CRIMINAL COPYRIGHT INFRINGEMENT, TRAFFICKING IN TECHNOLOGY DESIGNED TO CIRCUMVENT COPYRIGHT PROTECTION SYSTEMS, CIRCUMVENTING COPYRIGHT PROTECTION SYSTEMS, <u>AND NOTICE OF FORFEITURE</u>**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** **14-35** |
| **v.** | * | **SECTION:** **SECT. G MAG. 4** |
| **RAINER WITTICH** | * | **VIOLATIONS: 18 U.S.C. § 2** |
| **THE BRINSON COMPANY** | | **18 U.S.C. § 371** |
| | * | **18 U.S.C. § 2319** |
| | | **17 U.S.C. § 506(a)(1)(A)** |
| | * | **17 U.S.C. § 1201(a)(1)(A)** |
| | | **17 U.S.C. § 1201(a)(2)(A)** |
| | * | **17 U.S.C. § 1204(a)(1)** |

\*     \*     \*

The Grand Jury charges that:

## <u>COUNT 1</u>
### <u>(Conspiracy)</u>

**A.    <u>AT ALL MATERIAL TIMES HEREIN:</u>**

1.    **RAINER WITTICH** ("**WITTICH**") was a resident of River Ridge, Louisiana, and the owner and operator of **THE BRINSON COMPANY** ("**TBC**"), a Harahan, Louisiana-based company.    **TBC** sold, among other things, replacement parts for Mercedes-Benz

Fee_____
√ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No._____

automobiles. Additionally, **TBC** sold diagnostic equipment for automobiles, including diagnostic equipment for Mercedes-Benz automobiles.

2.      Daimler AG was an automaker headquartered in Stuttgart, Germany, that produced and sold Mercedes-Benz ("Mercedes-Benz") automobiles. Mercedes-Benz USA ("MBUSA"), a division of Daimler AG, was responsible for the distribution and marketing of Mercedes-Benz automobiles in the United States. In addition to automobiles, Daimler AG produced, and MBUSA distributed in the United States, automotive parts and equipment for both commercial and consumer use.

3.      Daimler AG produced the Star Diagnostic System ("SDS"), a hand-held computer designed to aid in the diagnosis of automotive systems with electronic controls and interfaces.

4.      The SDS consisted of a tablet-type computer with a touch screen interface running the Windows XP operating system. Included with the SDS was a multiplexer (used for combining signals, and, in effect, negotiating the transmission of diagnostic information between an automobile and the SDS unit) and various connection cables. Installed on the SDS were software programs created by Mercedes-Benz to diagnose and repair Mercedes-Benz automobiles. Daimler AG provided authorized purchasers and lessors of the SDS regular software updates.

5.      The retail price of an authentic Mercedes-Benz SDS varied between approximately $8,300 and $22,000 in the United States. Additionally, in some instances, purchasers of the SDS would pay Daimler AG (or, in the United States, MBUSA) several thousand dollars per year to receive regular software updates.

6.      To purchase or lease an SDS from MBUSA, a purchaser or lessor had to execute a license agreement that governed the usage and distribution of the SDS and the SDS software.

The license agreement recognized that the software on the SDS was "confidential, proprietary, trade secret information" and that recipients of a license were prohibited from transferring, assigning, or providing the software to others without authorization from Daimler AG or MBUSA. The SDS software also sought to prevent unauthorized use of the software by requiring the input of an alpha-numeric code sequence (a "key" or "license key") to "unlock" the software.

7.      The Mercedes-Benz SDS and the software contained on the SDS unit constituted original works of authorship created and developed by Daimler AG fixed in a tangible medium of expression.

8.      Neither **WITTICH**, nor **TBC**, nor any of its employees, agents, or partners obtained a license to maintain, modify, resell, or distribute SDS or SDS software.

9.      The use of non-authentic or unauthorized SDS units increases the risk of Mercedes-Benz automobiles being stolen or suffering from misdiagnosed or undiagnosed problems.

## B.    THE CONSPIRACY:

Beginning at a time unknown, but not later than 2005, and continuing through on or about July 13, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, and other individuals and entities known and unknown to the Grand Jury, willfully and knowingly did combine, conspire, confederate, and agree to commit offenses against the United States, that is:

    a.  Criminal copyright infringement by reproducing and distributing without authorization at least ten copies of one or more copyrighted works, that is, fake versions of the Mercedes-Benz Star Diagnostic Systems that contained

and operated proprietary software developed by Mercedes-Benz, with a total retail value of more than $2,500, during a 180-day period, for purposes of commercial advantage and private financial gain, in violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Section 2319(b)(1);

b. Circumventing a technological measure that protected a copyright work, by willfully, and for the purpose of private financial gain, circumventing a technological measure that effectively controlled access to a work protected under Title 17 of the United States Code, in violation of Title 17, United States Code, Sections 1201(a)(1)(A) and 1204(a)(1);

c. Trafficking in a technology, product, service, and device, by willfully, and for purposes of private financial gain, knowing that the technology, product, service, and device was primarily designed and produced for the purpose of circumventing a technological measure that effectively controlled access to a copyrighted work, in violation of Title 17, United States Code, Section 1201(a)(2)(A) and 1204(a)(1).

## C.   OVERT ACTS:

In furtherance of the conspiracy, and to accomplish the purposes thereof, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, and other individuals and entities known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1.    Beginning in about 2001, **WITTICH** and **TBC**, in conjunction with Company A, a Durham, North Carolina-based company owned by R.B. that specialized in the sale of

remanufactured Mercedes-Benz parts and equipment, began developing, manufacturing, and making available for sale fake SDS units. **WITTICH**, **TBC**, and Company A would purchase specific, previously agreed-upon models of laptop computers to serve as the SDS unit and install copies of modified SDS proprietary software created by Daimler AG onto the computers.

2.       Company A was responsible for creating hardware for the unauthorized SDS units, including a "black box" that served the role of a multiplexer, while **WITTICH** and **TBC**, with assistance from Company A and others, obtained, modified, and duplicated the authentic SDS software created by Daimler AG by so that it would operate on their fake SDS units without authorization from Daimler AG or MBUSA. Occasionally, **WITTICH** and **TBC** would purchase "black box adaptors" and cables for the "black box" from the Ho Company, a Chinese-based manufacturer. In negotiating purchases from the Ho Company, **WITTICH** insisted that the "clone" devices function exactly like the original equipment manufactured by Daimler AG.

3.       In about 2004, Company B, a Rancho Palos Verdes, California-based company, and its owner, M.V., learned of **WITTICH**, **TBC**, and Company A's manufacture and sale of fake SDS. Company B offered independent technical information and support for Mercedes-Benz automobiles, among others, through websites to which members paid a monthly fee. In about 2005, M.V. and Company B began working with **WITTICH** and **TBC** to manufacture and sell fake SDS.

4.       In addition to providing the membership-only website to share information relating to the repair of automobiles, including Mercedes-Benz automobiles, M.V. conducted frequent, regular multi-day diagnostic training seminars around the country focused on Mercedes-Benz automobiles for which individuals could pay and enroll. At the seminars, M.V. and others lectured on matters related to the repair of Mercedes-Benz automobiles. **WITTICH**

occasionally spoke at the seminars.  Additionally, **WITTICH** and **TBC** regularly "sponsored" seminars, which enabled **WITTICH** and **TBC** to rent space at the seminars from Company B. **WITTICH** utilized the seminars as a way to build his customer base and to advertise and sell **TBC'S** products, including fake SDS units.

5.     On about October 15, 2011, during one of Company B's seminars located in San Diego, California, **WITTICH** attempted to convince a prospective purchaser to buy a fake SDS unit by explaining that **WITTICH** "pa[id] other people overseas to write software that tells the factory software it's ok to go onto a laptop."

6.     **WITTICH**, R.B., and M.V. discussed, and collectively set, the price at which they should sell their fake SDS.  For example, on October 28, 2011, **WITTICH** informed M.V. via e-mail that he intended to sell an SDS unit for $6,000.

7.     In about 2008, **WITTICH**, **TBC**, R.B, and M.V. began purchasing software for the fake SDS, as well as updates and "patches" for the software, from J.C., an individual who resided in the United Kingdom.  **WITTICH** and **TBC** paid J.C. to manipulate the Daimler AG's proprietary SDS software to make it operate on the defendants' laptop computers without Daimler AG's authorization or licensure.

8.     **WITTICH** and **TBC** would obtain, without authorization, updates to pre-existing versions of Mercedes-Benz proprietary software for the fake SDS on storage media such as CDs and DVDs from various sources including Company B.  After receiving new software or updates, **WITTICH** instructed employees of **TBC** to make copies of the discs and share them with Company A and Company B.

9.     One of the ways in which software and software updates were installed and activated on the fake SDS manufactured and sold by **WITTICH**, **TBC**, Company A, and

Company B was through the use of key generators, or "keygens" purchased from J.C.  Keygens are programs that generate an unauthorized license key or serial number that will activate (*i.e.*, "unlock") software by bypassing or overriding protections embedded in the software license so that the software can be used without buying a licensed version from the supplier.  **WITTICH**, **TBC**, Company A, and Company B used the keygens to override Mercedes-Benz's security protections and protocol on its SDS software.  The keygens were used in conjunction with other modifications made by **WITTICH**, **TBC**, Company A, Company B, and J.C. to make the software work on the fake SDS without authorization from Mercedes-Benz.

10.     When problems would arise with the manipulated software for the fake SDS that required sophisticated analysis, **WITTICH** would instruct employees of **TBC** to work with J.C. to fix the problem.

11.     Similarly, when Daimler AG would alter its proprietary SDS software or enhance security measures in an attempt to protect its software from "cracks," **WITTICH**, **TBC**, Company A, and Company B would work with J.C. to overcome the additional safety measures so that they could continue to manufacture and sell fake SDS.  For example, on June 18, 2010, **WITTICH**, R.B., M.V., and J.C. discussed via e-mail how to overcome safety measures Daimler AG implemented on updates to its factory SDS software "as a direct result of cracks and fixes we have made."

12.     Occasionally, a fake SDS unit sold by Company A or Company B would actually come from **TBC**.  In such instances, after a customer ordered a fake SDS from Company A or Company B, R.B. or M.V. would notify **WITTICH**, and an employee of TBC would either send the fake SDS via commercial interstate carrier, including Federal Express and United Parcel

Service ("UPS"), from Harahan, Louisiana, to Company A or Company B who would then send it on to the customer or send the fake SDS directly from Harahan, Louisiana, to the customer.

13.     When Company A, Company B, or one of the customers to whom Company A or Company B sold a fake SDS had a problem or needed updated software, **WITTICH** and **TBC** would provide the updated software or perform repairs. For example, in about October 2010, Customer 1, an auto repair company located in Encinitas, California, who had purchased an unauthorized SDS from Company B, developed a problem with the unauthorized SDS. M.V. notified **WITTICH**, who instructed M.V. to have Customer 1 send the fake SDS to TBC in Harahan, Louisiana, via interstate commercial carrier. At **WITTICH'S** direction, an employee of **TBC** repaired the fake SDS at no charge and sent it via interstate commercial carrier from Harahan, Louisiana, to Customer 1.

14.     Between about 2001 and not earlier than July 2012, **WITTICH, TBC**, Company A, and Company B, sold the fake SDS for between approximately $5,000 and $11,000 each, depending on market demand and other factors. **WITTICH** and **TBC** sold not fewer than approximately 700 fake SDS, and Company B sold not fewer than 95 fake SDS, including at least 10 copies that were reproduced and distributed during any 180-day period.

15.     On about June 16, 2012, upon learning that Daimler AG had notified J.C. that his conduct was in violation of civil and/or criminal laws, M.V, R.B., J.C., **WITTICH**, and others discussed via e-mail a plan to have J.C. "go underground and off the radar" and continue providing assistance and support in the production of fake SDS.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Copyright Infringement)

**A.**     **AT ALL TIMES MATERIAL HEREIN:**

The allegations of Section A and C of Count 1 are hereby realleged and incorporated herein in their entirety.

**B.**     **THE OFFENSE:**

Beginning at a time unknown, and continuing until on or about July 13, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, did willfully, and for the purpose of commercial advantage and private financial gain, infringe the copyright of copyrighted works by distributing during a 180-day period ten (10) or more copies of the copyrighted works, which have a total retail value in excess of over $ 2,500.

All in violation of Title 17, United States Code, Section 506(a)(1)(A) and Title 18, United States Code, Sections 2319(b)(1) and 2.

## COUNT 3
### (Trafficking in Technology Designed to Circumvent Copyright Protection Systems)

**A.**     **AT ALL TIMES MATERIAL HEREIN:**

The allegations of Section A and C of Count 1 are hereby realleged and incorporated herein in their entirety.

**B.**     **THE OFFENSE:**

Beginning at a time unknown, and continuing on or about July 13, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, did traffic, and attempt to traffic, for purposes of commercial advantage and private financial gain, in a technology, product, service, and device, specifically software,

knowing that the technology, product, service, and device was primarily designed and produced for the purpose of circumventing a technological measure that effectively controls access to a copyrighted work protected under Title 17 of the United States Code, namely proprietary software designed to operate and function on the Mercedes-Benz Star Diagnostic System.

All in violation of Title 17, United States Code, Sections 1201(a)(2)(A), 1204(a)(1), and Title 18, United States Code, Section 2.

## COUNT 4
## (Circumventing a Technological Measure that Protects a Copyright Work)

**A.      AT ALL TIMES MATERIAL HEREIN:**

The allegations of Section A and C of Count 1 are hereby realleged and incorporated herein in their entirety.

**B.      THE OFFENSE:**

Beginning at a time unknown, and continuing until on or about July 13, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, did willfully, and for purposes of commercial advantage and private financial gain, circumvent and attempt to circumvent a technological measure that effectively controls access to a work protected under Title 17 of the United States Code, namely proprietary software designed to operate and function on the Mercedes-Benz Star Diagnostic System.

All in violation of Title 17, United States Code, Sections 1201(a)(1)(A), 1204(a)(1), and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE

1.      The allegations of Counts 1 through 2 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to

the United States of America pursuant to the provisions of Title 18, United States Code, Section Section 2323.

2.     As a result of the offenses alleged in 1 through 2, the defendants, **RAINER WITTICH** and **THE BRINSON COMPANY**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 2323, any property used, or intended to be used, in any manner or part to commit or facilitate the commission of the offenses and any property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of said offenses.

3.     If any of the property subject to forfeiture pursuant to Paragraph 2 of this Notice of Forfeiture, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

        All in violation of Title 18, United States Code, Section 2323.

A TRUE BILL:

_____
FOREPERSON

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

JORDAN GINSBERG
Assistant United States Attorney
Illinois Bar No. 6282956

New Orleans, Louisiana
February 13, 2014

12

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

### RAINER WITTICH
### THE BRINSON COMPANY

# INDICTMENT

**FOR CONSPIRACY TO COMMIT CRIMINAL COPYRIGHT INGRINGEMENT, CRIMINAL COPYRIGHT INFRINGMENT, TRAFFICKING IN TECHNOLOGY DSIGNED TO CIRCUMVENT COPYRIGHT PROTECTION SYSTEMS, CIRCUMVENTING COPYRIGHT PROTECTION SYSTEMS**

**VIOLATIONS:**

18 U.S.C. §2
18 U.S.C. §371
18 U.S.C. §2319
17 U.S.C. §506(a)(1)(A)
17 U.S.C. §1201(a)(1)(A)
17 U.S.C. §1201(a)(2)(A)
17 U.S.C. §1204(a)(1)

_A true bill._

_____
_Foreperson_

_Filed in open court this _____ day of _____
_____ A.D. 2014.

_____
_Clerk_

Bail, $ _____

_____
Jordan Ginsberg
Assistant United States Attorney